JOSEPH C. GILCHRIST v. MARGARET MANNING AND GEORGE MANNING.

*Foreclosure — Want of consideration — Compromise.*

1. A man sold a sailor a rotten old boat which was described on the ship-broker's books as possessing various virtues that it did not have. The sailor and his wife gave back a mortgage on the wife's house. The boat's defects were not so apparent but that the sailor used her for a long time in the hope that he could make her do, but she was too unseaworthy, and he suffered great losses. The wife saw the man who sold the boat and claimed that part of the notes given him ought in fairness to be given up, and he referred her to his lawyer, but instructed the lawyer not to give them up until she signed a receipt for all claims resulting from the sale. She would not sign at first, and only did so on the lawyer's assurance that if she did not mean to bring a suit, signing would make no difference to her. *Held,* that this advice was not true in law as it took account of actions only, and not of defences; the compromise, therefore, could not prevent the sailor and his wife from resisting foreclosure on the grounds of a want of consideration and of fraud.

2. One who enters a vessel on a ship-broker's books as for sale is responsible for the correctness of the data of description there appearing if they were meant to be relied on and were relied on.

3. The continuous use which the purchaser of a vessel may be compelled to make of it after discovering defects, does not waive damages to which he is entitled therefor, whatever effect it may have on his right to a rescission.

Appeal from Wayne.   (Chambers, J.)   June 6.—June 18.

FORECLOSURE bill.   Complainant appeals.   Affirmed.

*Lillibridge & Latham* for complainant.   Purchasers are estopped from alleging fraud in the sale when they have used the property and made a payment on the price and do not offer to return it: *Crippen v. Hope* 38 Mich. 344; *Craig v. Bradley* 26 Mich. 369; Bigelow on Fraud 184; 2 Pars. Cont. 780.

*Dwight N. Lowell* and *Otto Kirchner* for defendants.   Misrepresentations, though unintentional, may operate as fraud:

*Baughman v. Gould* 45 Mich. 482 ; *Converse v. Blumrich*
14 Mich. 108 ; *Steinbach v. Hill* 25 Mich. 78 ; *Webster v.
Bailey* 31 Mich. 36 ; *Starkweather v. Benjamin* 32 Mich.
305 ; *Browne v Moore* 32 Mich. 254.

CAMPBELL, J. Complainant filed his bill to foreclose a
land mortgage, made on dwelling-house property in Detroit,
belonging to defendant Margaret. The court below dis-
missed the bill for reasons referring to want of consideration
and fraud.

The mortgage and notes for $2000 formed part of a con-
sideration of $5000 which was the agreed purchase price of
a schooner named the " Cornelia Amsden." The bargain
was made April 14, 1881, at Detroit, defendants then being
there, and complainant also, although he lived in Ohio. The
vessel was then at Alpena, and not accessible.

Complainant had entered this with other vessels for sale
on a ship-broker's books, and there were placed there certain
data of description. There is some conflict as to just when
and how these entries were completed, but as we are satisfied
from the testimony that they contain the actual representa-
tions on which the parties bought, this is not important.
There is some doubt also, how far complainant intentionally
and with actual knowledge to the contrary, made this show-
ing. But as it was actually made and relied upon, and
intended to be relied upon, he is responsible for the correct-
ness of the statements.

The description of the vessel was that she measured 184
tons, was rated B 2, with lumber capacity of 225 thousand
feet, and draft of 8½ to 9 feet loaded, built in 1863, with
new stanchions, new bulwarks, new rails and stringers, cen-
tre-board and box, and new foresails, and all the canvas good.
On these and other representations of the same sort, the
defendants bought the vessel for $5000, paying $1000 down,
giving notes for $2000, secured by mortgage on the vessel,
and the remainder covered by the mortgage now in suit.

When Captain Manning went up a few weeks after to take
possession he found the vessel outside of the pier at Alpena,
loaded with lumber, and with considerable water in her hold

frozen up.   He ran her down to Sandusky and unloaded her, and thereafter continued to use her for some months for lumber.   The canvas, except the foresail, was not suitable or sufficient, and he was obliged to use her as a barge, so that she was towed back and forth, and did not usually run under sail.   During the latter part of the season she broke loose from the rest of the tow on an occasion off Sand Beach, and drifted ashore.   The captain, his family and crew left her while she was helpless, about ten miles from land, and got ashore without serious difficulty in a small boat.   The vessel became water-logged and wrecked.   She was subsequently taken into dry-dock and repaired at an expense, as shown, of $4092.   The material-men libeled her for repairs and she was sold in admiralty for $2400, and afterwards brought $3000 at private sale.

The testimony showed that the vessel was in very bad condition and unseaworthy; that her timbers were rotten, and that there had been no such renewal and repairs as were represented, and that her canvas was not good.   The value was variously estimated, but seems to have been regarded by the most satisfactory witnesses as worth no more than $2000. We think the case shows that defendants were defrauded in the sale at least $3000, besides the personal risks in using an unseaworthy vessel, and the other losses.

We do not see how the continued use of the vessel which defendant George Manning was compelled by his circumstances to make could be any waiver of damages, whatever might be the case as to rescission.   But it is, in our opinion, reasonably certain that while the condition of the canvas was soon discovered, as well as some defects in the vessel herself, the extent and dangerous character of the decay and bad condition of the hull were not fully ascertained until after the wreck, and defendants were not guilty of any serious laches in that regard.   After the vessel went into dock she was made liable for repairs which defendants could not have paid for without losing more than the vessel would warrant them in paying.

Having thus a claim for reduction of their purchase liabil-

ity, the question is raised whether they have not waived or compromised it.

In addition to the $1000 first paid, defendants paid $1000 of the notes secured by the chattel mortgage, which was destroyed by the maritime lien as enforced for repairs. In July, 1882, Mrs. Manning went down to Vermillion, where complainant lived, and had an interview with him, the result of which was that he agreed that he would give up to her the notes for $1000 which had been secured by the chattel mortgage. He claims that this was done as a final compromise of all claims for the damages which defendants claimed to have suffered. She denies that there was any such understanding, and insists they were to be surrendered unconditionally. The testimony upon this is directly in conflict. The notes were then in Detroit in the hands of complainant's solicitor, and complainant gave her a letter to him directing him to deliver her the notes, but saying further that he would write a letter the next Monday and that Mr. Latham might deliver them upon receipt of that further letter. In that letter he directed Mr. Latham to take from her a receipt in full for all claims resulting from the sale, and not to let her have the notes without it.

When she called on Mr. Latham certain things took place on which there is also some diversity of proof. Mr. Latham would not give her up the notes unless she would sign this receipt. She says, and this is not distinctly contradicted, that Mr. Latham told her the notes were not of any value, but might under some contingencies be made available by legal proceedings in case of her death. Both agree that she hesitated about signing the receipt, and it appears, we think, that she appealed to Mr. Latham whether he would advise her wrongly, and he said he would not. He advised her to sign it and, as she claims, told her it was of no importance and was not conclusive on her, but that she must go through that form before he could give her the notes. Mr. Latham's version is that when she objected to signing he asked her whether she was going to bring any suit or press any demand against complainant; and she saying she was not, he told her

the receipt would only bind her not to do what she said she was not going to do, and would put her in no different position from her present one, and that it would make no difference to her whether she signed or not. Just before she signed she hesitated again and he told her to sign it. She asked for the letter, but he told her he wished to keep it as it related to other things as well. This letter did not claim that she had agreed or understood she was to give such a receipt, but told Latham not to give up the notes unless she did, and otherwise to keep the notes and chattel mortgage and look after the property.

It is impossible to read Mr. Latham's testimony without seeing that in this transaction Mrs. Manning acted entirely on his advice and assurances, and that he so understood. Whatever may have been his own good faith in the matter,—and it is not necessary to question it,—we have no doubt she was misled into signing a discharge which she did not understand to be any such thing. And the advice given her was not true in law, for it did not take into the account anything but active proceedings, and made no reference to any possible defence under this mortgage, which at that time she evidently supposed would not be enforced. While all persons may be expected to use some caution in their dealings, yet from what we gather from this record we think it evident that neither of the defendants had much experience in business matters, and that she was not guilty of any culpable negligence in not protecting herself more carefully than she did. A compromise which she did not suppose to be a compromise, and which was so grossly unfair in its results, cannot be held conclusive under all these circumstances.

The subsequent dealings in regard to getting this mortgage satisfied are not claimed by complainant to have materially changed her rights if she had any, and they do not improve the position of complainant. We need not refer to them. Neither do we think it necessary to expand the details of the testimony. Upon the whole case we are satisfied that the court below took a correct view of the merits, and was justified in holding that the defendants gained nothing more by

the refusal to enforce these securities than they were entitled to.

The decree should be affirmed with costs.

The other Justices concurred.