HARRIS v. EGGER.

(Circuit Court of Appeals, Sixth Circuit. October 5, 1915.)

No. 2596.

1. FRAUD ⚌38—ACTIONS—WAIVER.

Where defendant, who was president and in control of a corporation, acquired plaintiff's stock through misrepresentations, plaintiff's delay of three years in instituting suit to recover for the fraud will not be held a waiver, where defendant did not in the meantime change his position, and the rights of no third parties intervened, for, while fraud may be waived, there must be an intent, or some change of position by the defendant.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 60; Dec. Dig. ⚌38.]

⚌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. FRAUD ⊚⟿31—RIGHT OF ACTION—EFFECT OF ELECTION.

Where a seller was induced to part with his property for much less than its value by reason of the buyer's fraudulent statements, an action to recover for the fraud was an affirmance of the contract.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 47, 48; Dec. Dig. ⊚⟿31.]

3. SALES ⊚⟿201—PERSONAL PROPERTY—TITLE.

Where ordinary personal property is distinctively identified and sold, and the purchase price paid, title will pass without delivery.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 529–541; Dec. Dig. ⊚⟿201.]

4. COURTS ⊚⟿363—FEDERAL COURTS—STATUTES.

The federal courts will give effect to a state statute concerning shares of stock in corporations.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 939–949; Dec. Dig. ⊚⟿363.

State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

5. FRAUD ⊚⟿35—ACTIONS—WAIVER.

In view of Shannon's Code Tenn. § 2066, declaring that stocks in all private corporations are personal property, plaintiff, who through defendant's misrepresentations was induced to sell his stock for less than its actual value, did not, because of his failure to promptly deliver the certificate after payment of the purchase price, waive his right to recover for the fraud, where plaintiff, when delivering the certificate, notified defendant of his intention to sue, for title had passed, and plaintiff in the interim exercised no rights by virtue of his retention of the certificate, which merely stood for the shares.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 55, 57; Dec. Dig. ⊚⟿35.]

6. PLEADING ⊚⟿236—AMENDMENTS—ALLOWANCE.

The allowance of an amendment to conform the pleadings to the proof, which did not materially enlarge the issue, is within the discretion of the court.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 601, 605; Dec. Dig. ⊚⟿236.]

7. EVIDENCE ⊚⟿271—ADMISSIBILITY—LETTERS.

In an action for fraudulent misrepresentations made on purchasing shares of stock, letters written by plaintiff, which were not in contradiction of his testimony, as well as those by defendant, which contained self-serving declarations, were properly excluded.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1068–1079, 1081–1104; Dec. Dig. ⊚⟿271.]

In Error to the District Court of the United States for the Western District of Tennessee; John E. McCall, Judge.

Action by John R. Egger against Earl A. Harris. Judgment for plaintiff, and defendant brings error. Affirmed.

Egger recovered a verdict and judgment against Harris for alleged fraud and deceit touching the purchase and sale of certain shares of stock, and Harris brings error. Egger owned 24 shares, of the par value of $2,400, in a Tennessee corporation, the Woods-Harris Iron & Supply Company, the name of which was changed to Harris Iron & Supply Company. Harris was president, and "running the business," of the company before and after the change in name, and during the time of the happening of the events which gave rise to this controversy. Harris resided in Memphis, Tenn., where the company

⊚⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was located, and Egger in West Point, Miss. In August, 1909, Egger called at the office of the company in Memphis, when he was invited by Harris to accompany him to the Tennessee Club. On the way to the club a conversation arose as to the condition of the company—Egger testifying that Harris said the "business had gone to h——l," but that he could get Egger out then and make him safe; and Harris testifying that he said "the company was narrowing down to a very close corporation, and he [Egger] was about the last outside stockholder, and that I would advise him to sell his stock." "I am going to give you a good price for it, and a better price than you could sell it to anybody else. As you put in $1,000 I am going to give you $3,000 for your $1,000." The conversation was resumed at the club; Egger stating that Harris said: "I will get you out on $3,000. * * * You can either take that, or you won't get a d——n cent;" Egger responding, as he testifies: "I first refused—told him I wanted a statement—I did not know what the business was doing. * * * I told him that I had always had confidence in him, and felt that he would protect me in every way, and he assured me of that fact." Harris then caused a check for $3,000 to be prepared, which he signed and tendered to Egger. Egger testifies that he refused the check, and Harris tore it up and again told him that he "would not get a d——n thing out of it" unless he took the sum named. "Then I told him, if he felt that way about it, I would have to accept his check."

This part of the transaction is not disputed in material part. Harris admitted in cross-examination that he was running the business, and knew at the end of each year what the company made; that he advised Egger as a friend concerning the sale, and that Egger always considered him as a friend; yet Harris did not state the financial condition of the company or the book value of the stock. Admittedly a second check, like the first, was prepared in favor of Egger and received by him, the check bearing date August 30, 1909; and Egger presented this check for payment, and received and retained the money. Egger did not have his certificates with him at the time he received the check. Patteson, secretary and treasurer of the company, was present and prepared the two checks at the Tennessee Club, and testified that upon accepting the last check Egger said he would send the certificates of stock to Harris, and further: "Q. Was that a part of the agreement? A. Yes, sir." This was neither corroborated nor denied by Harris or Egger. Patteson and Harris both testified, however, that about a month later the former wrote to Egger requesting him to send the certificates; but they were not given to Harris until shortly before commencement of the suit in March, 1913. October 28, 1909, Egger wrote a letter to Harris, which was in substantial harmony with his testimony, and which contained a request for a statement showing the condition of the business of the company. This letter was received in evidence without objection, but the answer of Harris, dated October 29, 1909, was excluded as immaterial, except a paragraph in which Harris insisted that he had never told Egger that the business of the company was in bad condition, but that he had always told him "the business was prospering." Other letters of the parties, from November 3 to 29, 1909, were offered by defendant, and were rejected, and made the subject of assignments. No further correspondence passed directly between the parties; but two letters, one in February, 1910 (which was ruled out, though error not assigned), and another on March 1, 1913, were sent by Egger's counsel to Harris. Between the dates last mentioned, Egger was seriously ill, and so incapacitated for a period of about two years. With the last letter alluded to Harris received the certificates of stock in question. The letter is as follows: "Dear Sir: I represent John R. Egger, who claims that you are indebted to him on account of alleged misrepresentations made with respect to the purchase of certain shares of stock of the company of which you are president. He recognizes your right to have the stock delivered, and I inclose the following certificates: [Certificates representing 24 shares described.] On behalf of Mr. Egger, it is my purpose to institute action against you, and of course with this you have no concern, except to make your defense. My present purpose is to deliver to you the certificates for the 24 shares of stock, and I inclose them." The stock had no market value. The purchase price in dispute was $125 a share. Evidence was introduced tend-

ing to show that at the time of this purchase Harris had become the owner of nearly all the capital stock of the company, which was $29,500 face value; that the stock was worth $210 a share; and that in September following the Egger transaction Harris paid Patteson $184 a share for his stock. Proof was also offered as to the value shown by the books of the company.

The issues were presented by declaration and pleas. The original declaration was in one count, and at the close of the evidence a second count was added. The first plea was the ordinary one of not guilty. The second plea was amended, and a demurrer thereto sustained, before trial on the merits. The original declaration, denied by the first plea, contains, among other allegations, in substance the following: Egger was ignorant of the financial condition of the company and of the actual value of the stock; Egger had implicit confidence in Harris and relied upon his representations: Harris conceived the idea of purchasing the stock of the company, knew its value, and as president bore a trust relation to the stockholders; Harris, knowing of Egger's ignorance of the condition of the company and of his faith in him, falsely and fraudulently represented to Egger that the company's affairs were in bad shape, that unless Egger sold his stock he would never get anything out of it, and that the stock was worth less than $3,000, when in truth it was worth approximately $7,500; Egger, relying upon these representations, was induced to sell his stock for $3,000, to his damage in the sum of $4,500.

By the amended second plea it is alleged that plaintiff is estopped to deny that the price paid was fair and reasonable because of certain facts stated and pleaded in bar of the action. These facts in effect were: Sale and purchase of the stock, August 30, 1909, by delivery and acceptance of check for $3,000; assurance then given by Egger, as part of the contract of purchase and sale, that the certificates would be promptly delivered; retention of the certificates until March 1, 1913, although repeatedly demanded, and their voluntary delivery on that date; failure to bring suit until March 4, 1913. The plea also contains copies of the letters above referred to, but their contents are not necessary to an understanding of the grounds urged in support of the plea. Assignments concerning the ruling upon demurrer to the plea and upon the allowance of amendment to the declaration are considered in the opinion.

R. P. Cary, of Memphis, Tenn., for plaintiff in error.

Caruthers Ewing, of Memphis, Tenn., for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. (after stating the facts as above). The recovery below, if at all rightful, was moderate; it was $1,750. No special instructions to the jury were requested, and no exception was reserved to the general charge. The charge as a whole is not contained in the record; a portion of it is set out in the eighteenth assignment, but counsel frankly concede that this is not well taken because of the absence of exception. It must therefore be assumed that the instructions to the jury were rightly conceived and given; and, in view of the allegations of the declaration and the tendency of the evidence, the judgment should stand, unless prejudicial error intervened under the rulings upon the demurrer or in the course of the trial.

[1, 2] The question of leading importance is whether Egger condoned the fraud and deceit upon which his action is founded. This question was presented upon the demurrer to the plea, and counsel for Harris insist that it inheres in the admitted facts and operates to defeat the action. The theory of the second plea, as amended, is twofold: One

feature is the delay and consequent acquiescence from 1910 to 1913, before instituting the suit; the other is the voluntary character of the delivery of the certificates of stock, independently of the delay. We are not impressed by the feature of delay. Assuming that it was competent for the parties to agree, and that it was agreed as stated in the plea, that Egger should promptly deliver the certificates, it is not perceived how the failure so to deliver operated to the prejudice of Harris. The certificates simply represented the familiar rights and interests of a stockholder in the corporation and in respect of its property. It does not appear that Egger attempted actively to exercise any of the rights of a stockholder, such as to claim or receive dividends, or even to vote the shares represented by the certificates, between the dates of the sale and delivery of the certificates. Harris was in official and practical control of the company and its property throughout that period. It is not shown that Harris' beneficial interest in the shares of stock would have been augmented by possession of the certificates, and in the end the certificates were turned over to him. The other phase of the plea presents the question whether the delivery of the certificates was voluntary, in the sense that it was intended to operate as a waiver of the fraud? Stated in another way, was it open to Egger both to deliver the certificates and reserve his right of action for the fraud and deceit?

It is not necessary to state that fraud may be waived; this is an ancient doctrine. Upon this record it must be conceded that Egger did not *intend* to waive either the fraud or his right of action. The correspondence admitted in evidence, as well as that ruled out, proves this. The letter accompanying the delivery of the certificates, which was written in behalf of Egger three days before commencement of the suit, notified Harris of the claim that he had made misrepresentations with respect to the purchase of the stock, and of the purpose of Egger to institute action against him. Harris nevertheless accepted and retained the certificates. We have a case, then, where the seller received the purchase price in ignorance of the buyer's fraud, and where the buyer accepted the certificates with notice of the seller's discovery of the fraud and purpose to sue for the consequent damages. True, the seller's delivery of the certificates was with knowledge of the fraud; but the buyer's acceptance was with knowledge of the purpose to hold him for the fraud. Why, in such circumstances, should the action rather than the defense be defeated by waiver? Of course, the seller might seasonably have resorted to rescission of the contract with tender of the purchase price; but the buyer here might have rejected the certificates and demanded return of the purchase price. Probably either of such courses would have resulted in litigation. It is reasonably plain, however, that the seller would have been in a worse situation after rescission of the contract than the buyer would after rejection of the certificates. The seller, as long as he might have held the stock, would have been in the position of a small stockholder contending for his rights against the large stockholder, who was officially and practically in control of the company and its property. The buyer's acceptance of the certificates, subject to notice of the proposed suit, was no doubt due to the favorable price at which he had succeeded in purchasing the stock; and if the

defense of waiver is open to him, his own fraud and deceit cannot but result to his advantage.

The case would present a totally different aspect, if it had been shown that Egger had delayed action with a view of thereby gaining something to which he was not entitled at the time he was induced to give his assent to the sale. There is not even a pretense of this character either in testimony or claim. So, too, if Harris had meanwhile changed his position to his detriment with respect to this stock. It is not suggested that the stock declined in value, or that Harris suffered any material inconvenience, during the delay. In short, if Harris had received the certificates at the time he delivered his check, there is nothing to show that his control of the company, or his enjoyment of the shares represented by the certificates, would have been changed in the slightest degree. If Egger had delivered his certificates at the time he received the purchase price, Harris would have been defenseless as against an action such as this; for in that event the contract of purchase and sale would obviously have been completely performed before discovery of the imposition practiced. This, however, is not of present importance, except to illustrate the narrow difference between the case supposed and the case we in fact have. Further, it is not shown that after payment of the purchase price any rights of third persons respecting either the certificates or the stock intervened to disturb the legal relations between Egger and Harris or Harris and the company. It is to be observed, also, that while language is used in some cases which, when considered abstractly, would seem at first blush to warrant a decision of a case like this either way, yet, when the decisions are considered with reference to their facts respectively, we think it safe to say that the controlling principle which is intended to be applied in the determination of questions of waiver is, that the person seeking damages for fraud and deceit in respect of his own contract must, in order to succeed, not only prove the fraud, but must himself, after discovery of the fraud, have been free from conduct which was calculated either to afford him advantage or to mislead the other party to his disadvantage under the contract.

[3-5] Counsel for Egger rightly concede that the present action for fraud and deceit operated at once to affirm and to rely on the contract. Nat. Bank & Loan Company v. Petrie, 189 U. S. 423, 425, 23 Sup. Ct. 512, 47 L. Ed. 879; Whiteside v. Brawley, 152 Mass. 133, 24 N. E. 1088; United States Trust Co. v. Chicago Terminal T. R. Co., 188 Fed. 292, 296, 110 C. C. A. 270 (C. C. A. 7th Cir.); Talcott, v. Friend, 179 Fed. 676, 103 C. C. A. 80, 43 L. R. A. (N. S.) 649 (C. C. A. 7th Cir.). However, the theory of counsel is that the subject of the sale was the shares of stock; that the contract of sale was not simply executory, but was executed, when the agreement upon the price was reached and payment made; and that, since the certificates were merely evidence of the corporate interest or shares sold, the nondelivery of the certificates could not disturb the executed character of the transaction. In short, as we understand the contention, it is that the essence of the thing sold was in purpose and intent placed by Egger in the control of Harris, who, it must be remembered, was president and manager of the company, at the time the purchase price was

paid and received, and that change of possession of the certificates could have operated only as further evidence of, and not as an essential step in, the consummation of the sale.

The basis of the contention is that the title to the shares passed to Harris at the time he paid the purchase price; and reliance is placed, first, upon the rule that where ordinary personal property is distinctly identified and sold, and the purchase price paid, title will pass without delivery (Miller v. Koger, 9 Humph. [Tenn.] 231, 237; Mayberry v. Lilly Mill Co., 112 Tenn. 566, 568, 85 S. W. 401; Hardwick v. Can Co., 113 Tenn. 659, 674, 676, 88 S. W. 797; State v. Kelly, 123 Tenn. 556, 562, 133 S. W. 1011, 36 L. R. A. [N. S.] 171; Hatch v. Oil Co., 100 U. S. 124, 131, 25 L. Ed. 554; Briggs v. United States, 143 U. S. 346, 354, 12 Sup. Ct. 391, 36 L. Ed. 180; Sutherland v. Brace, 73 Fed. 624, 625, 19 C. C. A. 589 [C. C. A. 7th Cir.]), and, next, upon cases defining the evidential character and object of certificates of stock, and so pointing out the familiar distinction between the certificates and the stock itself (Jellenik v. Huron Copper Mining Co., 177 U. S. 1, 12, 20 Sup. Ct. 559, 44 L. Ed. 647; McAllister v. Kuhn, 96 U. S. 87, 89, 24 L. Ed. 615; Merritt v. American Steel-Barge Co., 79 Fed. 228, 235, 24 C. C. A. 530 [C. C. A. 8th Cir.]; Helliwell on Stock and Stockholders, § 109, p. 185; Van Zile on Bailments and Carriers, § 246). It should be added that by statute of Tennessee it is provided:

"The stocks in all private corporations are personal property, and subject to levy and sale as such, the company in such case being required to make the proper entries in its stock or transfer book. * * *" Shan. Code, § 2066.

This statutory rule will be recognized, and where necessary enforced, by the federal courts. Jellenik v. Huron Copper Mining Co., supra, 177 U. S. at page 13, 20 Sup. Ct. at page 563 (44 L. Ed. 647). It is settled in Tennessee that the title to stock passes and becomes complete in the purchaser upon the assignment of the certificate, without registration or transfer on the stock book of the corporation. Smith v. Railroad, 91 Tenn. 223, 238, 18 S. W. 546, and citations, per Lurton, J.; McClung v. Colwell, 107 Tenn. 592, 600, 64 S. W. 890, 89 Am. St. Rep. 961. It was held in Parker v. Bethel Hotel Co., 96 Tenn. 252, 283, 34 S. W. 209, 216, 31 L. R. A. 706 (following the rule laid down by Judge Lowell in his work on Transfer of Stock, § 43):

"A sale or transfer of stock, to be valid, need not be in writing. The certificate need not, in fact, be delivered. A transfer is perfectly good, although the seller of the stock never had a certificate at all, and although no certificate is issued to the transferee."

Turning again to the amended second plea, it states that upon the delivery of the check and as part of the contract "the plaintiff [Egger] assured the defendant that the certificates so purchased would be delivered promptly." This in substance was also shown by one witness without contradiction, as pointed out in the statement; and while it was competent for the parties to make such a provision a condition of the contract, yet this was scarcely in the form of a condition, certainly it was not a condition precedent. Since it is not shown what was contained in the court's charge upon this subject, and the charge passed unchallenged, it is to be presumed, as we have already said, that ap-

propriate instructions were given in this behalf. The witness whose statement was taken upon the subject testified under apparent embarrassment by reason of his relations then to Harris and of his former relations to the company. Indeed, this was so obvious that, although the witness was called in behalf of Egger, counsel calling him was rightly permitted to exercise the privileges of a cross-examiner. It is not improbable that the jury declined to believe the witness; at any rate, in such circumstances, we cannot ascribe prejudicial error to the ruling upon the plea. Presumably any error in that behalf was cured at the trial.

This conclusion is the more satisfactory for still another reason. While it must be conceded that, apart from the fraud, Egger's consent to sell and his receipt of the purchase price involved an implied obligation on his part ultimately to deliver the certificates, it does not necessarily follow that the parties made such delivery a condition, *as between themselves,* to the consummation of the sale or to the immediate transfer of the equitable if not the legal ownership in the specific shares to Harris. Such a condition would have been opposed to the only rational inference that payment and receipt of purchase price would naturally signify. Beardsley v. Beardsley, 138 U. S. 262, 266, 11 S. Ct. 318, 34 L. Ed. 928. We therefore do not find any substantial foundation upon which the claim of waiver can be justly based. Every case of this character, like every case of fraud, must be considered and disposed of upon its own special facts. In determining such cases, it is hazardous either to formulate or to apply simply general rules; it might nearly as well be attempted to state or to rely on specific definitions of fraud.

It is earnestly insisted, however, that the present case is ruled by the decision of this court in Simon v. Goodyear Metallic Rubber Shoe Co., 105 Fed. 573, 44 C. C. A. 612, 52 L. R. A. 745. That was an action to recover damages for fraud and deceit in the procurement of a contract to acquire and furnish 250 tons of rubber waste. The inducement to enter into the contract was a representation made to Simon, the plaintiff, that certain pre-existent competition in the trade would cease. This did not happen; the competition continued, and so caused an advance in the price of such waste. The plaintiff admitted that he learned of the appearance and activities of competitors in the market before he made his first delivery. The rubber waste was to be delivered in monthly installments by September 1, 1895; the contract being dated April 18th of that year. The plaintiff sought and obtained a concession in respect of deliveries until the following December 1st, and in fact failed to deliver the agreed quantity until two months later, though in that time completed his contract; he received for each monthly delivery payment at the contract price. True, he had vainly sought for some concession in quantity or advance in price, and failing in this had notified defendant that he would carry out his contract and hold it responsible in an action for the loss he would sustain. Recovery was denied. There are several differences between that case and this. There the contract was wholly executory when plaintiff obtained knowledge of the fraud and made his first delivery. When he accepted an extension of time for performance,

he in effect renewed the contract for a longer period with knowledge of the deceit, and thereafter through expenditure and labor continued to perform everything he had undertaken to do; he speculated upon the chance of overcoming the only cause for his dissatisfaction—the competition. This was the equivalent of having originally entered into the contract with knowledge of the competition. Fitzpatrick v. Flannagan, 106 U. S. 648, 660, 1 Sup. Ct. 369, 27 L. Ed. 211; E. H. Taylor, Jr., & Sons v. First Nat. Bank of Aurora, Ind., 212 Fed. 898, 902, 129 C. C. A. 418 (C. C. A. 6th Cir.). If we are right in our interpretation of the record in the instant case, Egger must be treated as having sold and so passed title to specific shares of stock to Harris for an agreed purchase price received before discovery of the deceit. The paramount distinction, then, between the cases, is that Simon began and completed performance of an executory contract with knowledge of the deceit, while Egger parted with his property, certainly with the only feature of value it possessed, and received the price in ignorance of the deceit; the one was an executory and the other an executed, certainly a substantially executed, transaction when discovery of the fraud was made; and enough appears in the record of the present case to show that it was such a distinction as this that controlled Judge McCall in the court below.

Another decision upon which counsel for Harris especially rely is that of Kingman & Co. v. Stoddard, 85 Fed. 740, 745, 29 C. C. A. 413, 419 (C. C. A. 7th Cir.). The decision in that case was approved and in effect followed in the Simon Case, and we think the facts of the case are so far similar to those of the Simon Case that the one as well as the other is fairly distinguishable from the instant case. One example given by Judge Jenkins in the Kingman Case states the principle underlying the distinction which we think should be applied here:

"For example, if one by the imposition of fraudulent practices has been induced to purchase goods, and after their receipt discovers the fraud, he may rescind, or may affirm and have his action for the deceit. But if, before delivery of the goods, he has discovered the fraud, he may not then accept the goods, and still have an action for deceit."

No sound distinction can be stated between the effect of receiving purchased goods and that of receiving purchase price, before discovery of the fraud; and when, as here, the purchase price is so received, and the thing sold is at the same time practically parted with, the case is stronger than the one stated in the first of the two examples just quoted. Counsel are not in dispute concerning the rule, as under the well settled trend of decision they could not be, that where a contract induced by fraud has been executed before discovery, the defrauded party has the right of election either to rescind or affirm; and that where he elects to affirm he loses his right of rescission because of inconsistency of the two remedies (Mudsill Min. Co. v. Watrous, 61 Fed. 163, 186, 9 C. C. A. 415 [C. C. A. 6th Cir.]; Alger v. Keith, 105 Fed. 105, 118, 44 C. C. A. 371 [C. C. A. 6th Cir.]), though he may retain the thing he has received and also maintain an action for the fraud and deceit (Benjamin on Sales [7th Ed.] p. 486, and citations). If then the sale now under consideration should upon this record be

regarded as having been an executed transaction at the time the fraud was discovered, and we are disposed to believe it should, further discussion of the main question would seem unnecessary; however, we need not rest the decision wholly upon that view of the transaction. We think the transaction was at the time of discovery at least so far completed as to relieve Egger of the charge of waiver, upon turning over the certificates with notice of his purpose to sue for the fraud. At most, such act was but partial and formal evidence of the sale that had practically been completed before, and the notice was in contradiction of an intent thereby to condone the fraud.

In Cain v. Dickenson, 60 N. H. 371, 372, which was an action for deceit in the purchase of hay, a note had been received in payment and subsequent demand made thereon. Upon receiving partial payment, the seller stated that he would not take it if it should prevent his arresting defendant for obtaining the hay under false representations. It was held:

"The part payment of the note did not condone the fraud; it only mitigated the damages to the extent of the payment. But if part payment might under any circumstances have that effect, it could not here, for the plaintiff at the time stated that he did not waive his right to damages for the fraud."

The right so to avoid waiver is recognized in People v. Stephens, 71 N. Y. 527, 554. Furthermore, and apart from the effect of Egger's notice, the right of election of remedies before mentioned is not in all instances dependent upon whether the contract has been fully executed or performed. The rule extends to instances of partial execution or performance. As Judge Mitchell, who was an unusually safe interpreter of the law, said in Thompson v. Libby, 36 Minn. 287, 289, 31 N. W. 52, 53, while denying recovery for deceit in respect of a contract of sale where the transaction was wholly executory when the fraud was discovered:

"If the contract be executed in whole or in part before the fraud is discovered, it is well settled that the purchaser need not rescind, but may retain the property and also bring his action for damages on account of the deceit."

We understand this rule to be recognized and stated in the opinion in the Kingman Case, supra, 85 Fed. 745, 29 C. C. A. 420.[1]

See, also, Mallory v. Leach, 35 Vt. 156, 168, 169, 82 Am. Dec. 625; Pryor v. Foster, 130 N. Y. 171, 175, 177, 29 N. E. 123, reviewing

---

[1] We are confirmed in this by the comments appearing later in the opinion (85 Fed. at pages 747 to 749, 29 C. C. A. 420 to 422), upon People v. Stephens, 71 N. Y. 527, Parker v. Marquis, 64 Mo. 38, and Whitney v. Allaire, 4 Denio, 554; for the effort was to show that in Parker v. Marquis the subject of the sale had been delivered to and received by the defendant in ignorance of the fraud, saying further: "We need not stop to inquire whether that case was rightly decided, for it is not the case of one receiving property with knowledge of fraud;" and that in Whitney v. Allaire, the lessee took possession of the leasehold premises with knowledge of the false representation—that is, at a time when the contract was wholly executory. The two cases, therefore, point the distinction between a partially executed contract and a purely executory contract before discovery of the fraud. We have seen that the Kingman Case, like the Simon Case, possessed distinct elements of affirmance during the course of performance, which were designed to benefit the defrauded party, but nothing of this sort occurred in the instant case; and, further, it is not to

a number of decisions; Dennison v. Grove, 52 N. J. Law, 144, 146, 147, 19 Atl. 186; Peck v. Brewer, 48 Ill. 54, 62; Haven v. Neal, 43 Minn. 315, 317, 45 N. W. 612; Gilchrist v. Manning, 54 Mich. 210, 211, 212, 19 N. W. 959; City Deposit Bank v. Green, 138 Iowa, 156, 164, 115 N. W. 893; May v. Loomis, 140 N. C. 350, 353, 359, 52 S. E. 728; Nysewander v. Lowman, 124 Ind. 584, 588, 24 N. E. 355; Huber Mfg. Co. v. Hunter, 99 Mo. App. 46, 55, 56, 72 S. W. 484, and citations; Guffey v. Clever, 146 Pa. St. 548, 559, 560, 23 Atl. 161.

We are the more content to apply the rule of partial execution here, because of the relations of the parties and of the consequent disadvantage to which Egger would have been subjected if he had chosen to rescind the contract. We have alluded to this before, and the facts are too plain to require elaboration of this feature of the case. It is said that the court is in effect asked to make a new contract for the parties. The case, however, is not different in this respect from what it would have been if the certificates had been delivered simultaneously with the receipt of payment. In that event, as we have already stated, there could have been no question of the right of recovery. To sanction recovery for fraud and deceit certainly is not to make a contract.

[6, 7] It is urged that the court erred in allowing amendment to the declaration by adding a second count. The object of the amendment was to conform the declaration to the proofs, but we do not see that it materially enlarged the scope of the original count. The order was plainly within the discretion of the court. Southern Ry. Co. v. Gadd, 207 Fed. 277, 279, 125 C. C. A. 21 (C. C. A. 6th Cir.). Further, it is claimed that the exclusion of certain letters before alluded to and which passed between the parties to the suit was error. Such as were written by Egger do not appear to be in contradiction of his testimony. It is to be said of those of Harris that the statements they contain were either self-serving or immaterial. Surely error is not predicable of the rulings excluding such letters as these.

Some of the assignments are practically withdrawn, and our consideration of those not expressly passed upon fails to disclose reversible error.

The judgment must be affirmed, with costs.

---

be forgotten that in the Simon Case the discovery occurred while the contract was entirely executory. We therefore need not concern ourselves with the criticisms before alluded to of Parker v. Marquis or Whitney v. Allaire, further than to say that both cases received approval later in the courts of last resort of the states in which they were decided. Nauman v. Oberle, 90 Mo. at pages 669, 670, 3 S. W. at page 381; Pryor v. Foster, supra, 130 N. Y. at page 178, 29 N. E. at page 124.