CHARLES C. HANSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 15398. Promulgated June 5, 1931.

*Millsaps Fitzhugh, Esq., W. F. Murrah, Esq.,* and *Ernest E. F. Wetteroth, C. P. A.,* for the petitioner.

*Brooks Fullerton, Esq.,* for the respondent.

591

594

598

**OPINION.**

LOVE: The petitioner originally pleaded, and presented his evidence in this proceeding upon the theory, that the fair market value of the properties involved was, in June, 1919, in excess of $1,500,000, and that the difference between that amount and the amount he agreed to pay therefor constituted a gift to him from Churchill. It would follow that the basis for determining the depreciation allowance and also the gain or loss from the resale of the properties was the sum of the gift and the amount paid, a total alleged to be in excess of $1,500,000.

The respondent has determined that the petitioner acquired the properties entirely by purchase during 1919 and he has computed

profits on resales of certain of them during 1919 and 1920 upon the basis of the amount petitioner paid, using the same basis to determine a depreciation allowance. Both parties, therefore, were proceeding upon the theory that Hanson acquired the properties involved during 1919.

Upon hearing, petitioner was permitted to amend his pleadings to conform to proof, whereupon he alternatively assigned as error that:

The date for determining the gain or profit, if any, to the petitioner should have been April, 1924, and not during the years 1919 and 1920.

The effect of this amendment is to deny that Hanson acquired the properties until April, 1924, when the full amount, plus the interest, which he was required to pay for the properties, had been paid to Churchill or/and his wife.

We do not believe the evidence in this case justifies a holding that a gift was intended.

We are of opinion that our determination should turn upon the issue raised by the amendment to the pleadings, quoted above. Stated in other terms, that issue is: Was the agreement evidenced by the correspondence between Churchill and Hanson, as set out in our findings, a contract of sale or a contract to sell?

In *Charles W. Dahlinger*, 20 B. T. A. 176, 183, the Board said:

The distinction between a contract to sell and a sale is fundamental in the law of sales, as is pointed out in Williston on Sales, 2d ed., vol. 1, ch. 1, where the following definitions are given.

A contract to sell goods is a contract whereby the seller agrees to transfer the property in goods to the buyer for a consideration called the price.

A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price.

\*　　\*　　\*　　\*　　\*　　\*　　\*

The distinction is some times expressed by the terms "executory" and "executed" sales. Whether a bargain between parties is a contract to sell or an actual sale, depends upon whether the property in the goods is transferred. If it is transferred, there is a sale, an executed sale, even though the price be not paid.

Sales and contracts to sell may both be subject to conditions expressed or implied, and conditions may be conditions subsequent or conditions precedent. A condition precedent requires that something shall happen prior to the vesting of the property in the buyer. A condition subsequent divests by its happening a title which has already vested.

\*　　\*　　\*　　\*　　\*　　\*　　\*

\* \* \* Although a contract to sell is consummated when the parties execute it, a sale, even where the subject of a contract, is incomplete and imperfect until title passes. But a sale is complete when title passes. At that moment both parties to the sale achieve what they set out to accomplish by the sale. A seller who formerly had property which he desired to sell, thereafter had that property no longer. He thereupon exchanged his right and title to the

property for the purchase price or the purchaser's promise to pay it. The property thereafter belonged to the purchaser and he had what he did not have before, an obligation to pay for it. The passing of title irrevocably and finally changed the rights of the parties to a sale.

The question whether a contract of sale is executory or executed depends primarily on the intention of the parties, to be gathered from the terms of the contract and such surrounding circumstances as may be legitimately considered as evidencing the intention. 23 R. C. L. 171, *Elgee Cotton Cases*, 22 Wall. 180; 22 U. S. (L. Ed.) 863; *Hatch* v. *Standard Oil Co.*, 100 U. S. 124; *Beardsley* v. *Beardsley*, 138 U. S. 262.

First, let us determine what the agreement was. It will be recalled that in 1917 Churchill bought in most of the properties of the Gulf Compress Company at a receiver's sale for a total price of $475,000. The properties then became known as the Churchill Compresses and the petitioner became manager of them. Churchill caused an appraisal of the properties to be made which indicated the then reproductive cost new (except the land), less depreciation, was $1,442,562.15, as of February 16, 1918. In the spring of 1918, Churchill declined an offer of approximately $1,250,000 for the properties.

During the spring of 1919 petitioner was negotiating the sale of certain of the properties for Churchill. Correspondence relating to such negotiations also contains the original proposition giving rise to the agreement we are considering. In a letter dated June 2, 1919, Churchill acknowledged receipt of certain letters relative to petitioner's progress toward sale of the compress properties, advised the petitioner of his illness, and continued:

* * * I would like to have had a talk with you, but as I cannot I will write you what I was going to talk about. Hanson I will sell you the whole outfit for $550,000.00 (Five hundred & Fifty thousand dollars) you can sell off this amount of the property, & keep the rest yourself, or you can form a company giving me the above amount in cash, & let any way to suit yourself, so long as you pay me the $550,000.00 of course the profits of the company is mine until you pay up.

The quotation above was Churchill's original offer, an offer to sell the properties for $550,000 *in cash*, the profits of the business to be Churchill's until the price was paid.

Under date of June 4, 1919, petitioner wrote to Churchill:

* * * you tell me you will take $550,000.00 for your compress properties. Captain, your price is too low. I am confident if I can have the time that I can ultimately realize for you on your compress properties about twice the amount mentioned, in the meantime operating them on the whole at some profit. However, if after further consideration you want to close up the matter now and are still willing to take $550,000.00 net for your compress interest in my charge, then you may consider the properties sold, as I will accept your propo-

sition and will send you a Contract of Sale as soon as Judge Sivley, your attorney here, can draw it up. * * * The only thing I am going to ask you now to do is to allow me as much as ninety days in which to raise the money.

In your letter you do not use the word "net." I mean by the word "net" that I will assume the payment of all taxes and the payment of all of your other liabilities, including the contingent liabilities growing out of the Gulf Compress Company's operations, which you assumed when you purchased those properties.

* * * if you conclude you are willing for me to have them for $550,000.00 cash, net to you, etc. I will take them.

On June 7, 1919, Churchill wrote the petitioner:

Referring to my offer to take $550,000.00 for the Churchill Compresses, * * *

* * * * * * *

Hanson, if you think my price is too low, you can allow me as much more as your conscience will permit. * * *

Yes, I meant *net* when I made the offer, so you will assume the payment of all debts of every character, * * * I am willing for you to have the Churchill Compresses at $550,000.00 cash, net to me * * * and you can have ninety days in which to pay me.

It was at this point that the parties reached an agreement. If it was an agreement of sale the petitioner then acquired the properties and an obligation to pay Churchill the $550,000, plus certain debts. If it was merely an agreement to sell, on Churchill's part, and to buy, on the petitioner's part, then the petitioner did not at that time acquire the properties. Some support for each view is found in the context. Going back to Churchill's original proposal, it will be noted that he asked $550,000, *in cash*. Petitioner's reply did not accept the exact terms of the offer, but requested 90 days in which to make payment. It was in effect a counter offer to buy the properties for $550,000 cash, net to Churchill, in 90 days, plus the repayment of advances and the assumption of certain of the latter's obligations relating to the properties. It advised Churchill also that if he was " still willing to take $550,000.00 net * * * then you may consider the properties sold," and that the petitioner would send him " a Contract of Sale," etc. Churchill's letter of June 7, 1919, accepted this counter proposal according to its terms.

It is no reflection upon either petitioner or Churchill to point out the very evident fact that their agreement reveals its lack of legal draftsmanship. Was petitioner's offer of $550,000 cash, net in 90 days, plus specified extras, a proposal to buy the properties on 90 days credit, or a proposal to buy the properties within 90 days for $550,000 net cash, plus the extras? And in accepting that proposal, did Churchill mean to sell the properties and allow petitioner 90 days credit for payment, or did he mean only to agree that he would sell the properties to petitioner for $550,000 net cash, plus the extras,

within 90 days? Succinctly stated, the question is, was the petitioner's obligation to pay Churchill $550,000 net cash a condition precedent or subsequent to a sale of the properties, i. e., to a transfer of the property right in them. We think a solution of this question requires resort to the parties' construction of their contract as indicated by their subsequent actions respecting it.

Petitioner's letter of June 13, 1919, to Churchill, detailed the obligations to be paid or assumed in addition to the $550,000 net cash which Churchill was to receive. It indicates that in the disposition of his compress properties through his agreement with petitioner, Churchill was to receive $550,000 net cash, and in addition payments would be made, or obligations assumed, on his behalf to the extent of $24,862.87, "plus interest at 6 per cent to the date of payment." The letter continued:

I have gone over this matter with Judge C. L. Sivley. The Judge thinks the correspondence passing between us is self-explanatory and constitutes a contract of a bona fide sale by you and purchase by me. Judge Sivley suggests, however, it might be better for both you and me to reduce our agreement to a more formal document. * * * If you concur I will turn over to Judge Sivley copies of the deeds to your properties, lease contracts and such other data as he may desire for such purpose.

The agreement was never reduced to a "more formal document" as petitioner suggested.

There is nothing in the subsequent correspondence between petitioner and Churchill, or in the subsequent agreement between petitioner and Mrs. Churchill, nor in the record in any way, to indicate the exercise of any of the common indicia of ownership of the properties by petitioner in his own right. Otherwise than as Churchill's agent, he was never in possession of any of those properties, nor any of the proceeds of sales, either cash or notes. Hanson claimed no part of the money or notes paid on the resales in 1919 and 1920. Under his contract to purchase, he was not entitled to receive, actually, or constructively, any part of that money or notes until 1924. His letter to Churchill, dated June 14, 1919, mentions "your property [Churchill's]."

Churchill's letter to petitioner, dated June 18, 1919, stated: "I think this year's profits belong to me anyhow." This is consistent with the condition of his original proposal of June 2, 1919, that "of course the profits of the company is mine until you pay up."

Petitioner was given broad authority, through powers of attorney, to act as Churchill's agent in the disposition of the properties. He continued to operate the properties and to negotiate sales of them. December 13, 1919, petitioner wrote Churchill advising that he had paid off about $300,000 of his obligation, that there remained due a balance of $274,862.87, and in addition $17,303.60, of interest. Peti-

tioner requested that he be allowed until December 19, 1919, to pay the interest, and 90 days longer to raise the balance of the purchase money. Churchill granted such extensions by letter of December 16, 1919.

Churchill died June 10, 1920, without having transferred the properties to petitioner, who still owed him approximately $275,000 of the purchase price. Mrs. Churchill, as sole heir and executrix, gave petitioner the necessary power of attorney and he continued to negotiate sales of the properties, sending the cash proceeds and all deferred purchase money notes to her. While the time for payment was extended to the ultimate extent of four years, the condition precedent—cash in advance, remained steadfast.

In April, 1924, the full amount of $574,862.74, together with all stipulated interest thereon, had been remitted in full to Churchill and/or to his widow. Mrs. Churchill then executed formal deeds transferring to petitioner such of the properties involved as remained unsold. She also surrendered to petitioner unpaid purchase money notes, reductions of which had been credited on petitioner's obligations to her husband and herself.

We think the whole history of the agreement and the parties' subsequent actions under it indicate that petitioner's payment to Churchill of $550,000 in cash was a condition precedent to completion of the sale, i. e., the transfer of title to him. The fact that receipt of the sum named, in cash, was a prerequisite to transfer of title, is strongly shown by the fact that although the Churchills took the purchase money notes as sales were made, such notes were not credited against the petitioner's obligation except as payments were made on them.

We conclude that the agreement between Churchill and petitioner, entered into in 1919, was an executory contract and that petitioner acquired no title to the properties involved during the years 1919 or 1920. It follows, at least under the facts in this case, that petitioner derived no profit upon the sale of such properties during the taxable years, and if at all, not until 1924, and, of course, he is not entitled to a depreciation deduction upon properties which he did not own. See *Gideon N. Steiff et al.*, 2 B. T. A. 1109; affd., *Stieff v. Tait*, 26 Fed. (2d) 489.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

Smith and Sternhagen dissent.