ROBERT L. STEARNS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WILMER T. CULVER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 37573, 37574. Promulgated November 30, 1931.

*Charles O. Rundall, Esq.*, for the petitioners.
*John H. Pigg, Esq.*, for the respondent.

1016

## OPINION.

Smith: For convenience, we will discuss the case as though petitioner Stearns had been a party to the original agreement, since his tax liability from this transaction must be determined in the same manner as that of petitioner Culver.

The petitioners contend that essentially the transaction was but a guaranty by them that as a result of their management the vendors (stockholders) would receive the book value of their stock. The petitioners' interests were contingent upon the successful results of their efforts. If and when successful they would and later did receive, as compensation for such efforts and their guaranty, whatever remained of value in the Lumber Company. Until the vendors received the stipulated amount, it is obvious that petitioners could have no reward and could not be in receipt of taxable income from the transaction in the form of dividends or otherwise.

The petitioners were experienced operators of lumber, coal, and salt properties. They had been called upon to operate enterprises that had suffered from poor management or other causes that resulted in financial difficulties. Once, at the request of the stockholders, they had taken over the operation of a lumber company under an arrangement whereby the company's debts were discharged, the stockholders were paid off, and the petitioners received whatever was left as their compensation. Again, they had performed similar services at the request of the bondholders of another company. The record indicates that their advice and services were sought in the management or liquidation of similar enterprises. The petitioners had been successful in these enterprises and had extended their operations into several states.

Representatives of the stockholders of the Lumber Company offered to sell its property and business to the petitioners in 1919. The petitioners were not interested in a purchase, but told the representatives of the stockholders that they would be interested in the management and operation of the Lumber Company on a speculative basis. Investigations were made, the value of the corporate property

determined, and an agreement entered into which in substance provided for the liquidation of the interest of the stockholders. The petitioners took over the operation of the Lumber Company and so conducted its affairs that the company was able to make payments to the trustees for the stockholders in 1923, which the respondent seeks to tax to these petitioners. The respondent contends, in effect, that the agreement of December 13, 1919, was an executed contract of sale; that thereafter the petitioners were the owners of the stock of the Lumber Company; and that the payments to the trustees represented either " dividends " within the meaning of section 201 of the Revenue Act of 1921, or income constructively received by the petitioners within the meaning of section 213 (a) of that act.

We are satisfied that the parties to this transaction did not intend a present sale by the execution of the agreement in 1919. The petitioners' method in such transactions negative any such intent, and the actual conduct of the parties and the express language of the several agreements show that there was no sale of the stock in 1919. Even assuming, but not deciding, that the 1919 agreement resulted in in the acquisition of the Lumber Company's stock by the petitioners, we are still confronted with the question of whether that agreement was a sale or a contract to sell. In *Charles W. Dahlinger*, 20 B. T. A. 176, 183, 184 (affd., *Dahlinger* v. *Commissioner*, 51 Fed. (2d) 662), we said:

The distinction between a contract to sell and a sale is fundamental in the law of sales, as is pointed out in Williston on Sales, 2d ed., vol. 1, ch. 1, where the following definitions are given:

A contract to sell goods is a contract whereby the seller agrees to transfer the property in goods to the buyer for a consideration called the price.

A sale of goods is an agreement whereby the seller transfers the property in goods to the buyer for a consideration called the price.

\* \* \* \* \* \* \*

The distinction is some times expressed by the terms " executory " and " executed " sales. Whether a bargain between parties is a contract to sell or an actual sale, depends upon whether the property in the goods is transferred. If it is transferred, there is a sale, an executed sale, even though the price be not paid.

Sales and contracts to sell may both be subject to conditions expressed or implied, and conditions may be conditions subsequent or conditions precedent. A condition precedent requires that something shall happen prior to the vesting of the property in the buyer. A condition subsequent divests by its happening a title which has already vested.

\* \* \* \* \* \* \*

\* \* \* Although a contract to sell is consummated when the parties execute it, a sale, even where the subject of a contract, is incomplete and imperfect until title passes. But a sale is complete when title passes. At that moment both parties to the sale achieve what they set out to accomplish by the sale.

A seller who formerly had property which he desired to sell, thereafter had that property no longer. He thereupon exchanged his right and title to the property for the purchase price or the purchaser's promise to pay it. The property thereafter belonged to the purchaser and he had what he did not have before, an obligation to pay for it. The passing of title irrecovably and finally changes the rights of the parties to a sale. A sale is then "consummated."

See also *Charles C. Hanson*, 23 B. T. A. 590, wherein we said:

The question whether a contract of sale is executory or executed depends primarily on the intention of the parties, to be gathered from the terms of the contract and such surrounding circumstances as may be legitimately considered as evidencing the intention. 23 R. C. L. 171; *Elgee Cotton Cases*, 22 Wall. 180; 22 U. S. (L. Ed.) 863; *Hatch* v. *Standard Oil Co.*, 100 U. S. 124; *Beardsley* v. *Beardsley*, 138 U. S. 262.

The agreement under which the stockholders of the Lumber Company transferred their stock to the trustees provides that "the full legal and equitable title in and to the * * * stock and the property rights and interests represented thereby" vested in the trustees, who "shall, and are, hereby authorized and directed to enter into a written contract for the sale of all of the * * * shares of * * * Stock * * * upon such conditions and terms as said Trustees in their sole judgment shall elect." The agreement of December 13, 1919, provides that:

Vendors * * * agree to bargain, grant, sell, convey, and transfer unto the Vendee[s] * * * the capital stock of the Company * * *.

* * * * * * *

(d) And upon full payment of the notes herein provided for, the Vendors covenant and agree to transfer or cause to be transferred to the Vendee[s] * * * all of the said shares of the capital stock * * *.

* * * * * * *

* * * hereby agreed to be sold * * *.

The first supplemental agreement (October 1, 1922), refers to the 1919 agreement "by the terms of which the said Trustees contracted to sell and the said * * * [petitioners] contracted to buy * * * the capital stock," and further provides that "The title to the * * * stock * * * shall continue in the Vendors as heretofore."

Although the second supplemental agreement (October 1, 1925), was entered into subsequent to the year before us, that agreement further shows the construction that the parties put upon the earlier agreement as "a contract * * * to sell" and further declares that:

* * * the Vendors shall and do retain title to the * * * stock * * * until * * * all of said promissory notes shall be fully paid and discharged and until full performance by the Vendees and the Company of

each and all of the stipulations and agreements of the original contract, as modified by the first Supplemental Contract and this Second Supplemental Contract and no title to said capital stock shall pass * * * until said purchase price, represented by said promissory notes, and interests, shall have been fully paid.

The parties to the transaction, viewing it as a contract for the sale of the stock, interpreted their agreement as passing title to the stock in 1928, when the petitioners had fully performed their contract and received the stock, which they treated as income in that year. The parties to the 1919 agreement intended to and did enter into an executory contract for the sale of the stock, which sale was consummated in 1928 when title thereto passed. Cf. *Webb Press Co.*, 3 B. T. A. 247; *Amalgamated Sugar Co.*, 4 B. T. A. 568; *Abraham B. Johnson*, 7 B. T. A. 820; *W. L. and J. D. Griffiths, Executors*, 10 B. T. A. 799; *Buckeye Engine Co.*, 11 B. T. A. 318; *Charles W. Dahlinger, supra; Lucas* v. *North Texas Lumber Co.*, 281 U. S. 11.

Furthermore, the proper interpretation of other terms of the 1919 agreement support the petitioner's contention that this transaction was not a purchase of either the stock or the assets of the Lumber Company. They declined to purchase. They investigated the company's condition and, as in other such enterprises, they felt that by reason of their experience they could operate and gradually liquidate the property of the Lumber Company and make a profit on the transaction. They found that the net quick assets of the company amounted to $459,420.30 and that the agreed value of the plant and timber was $947,040. The stockholders had advanced $267,000 to the Lumber Company which the petitioners agreed should be repaid. This obligation was evidenced by the Series A notes in that amount; the Series B notes represented the remainder of the quick assets. The Series C notes represented the value of the plant and timber. These notes were to be paid off by the Lumber Company, first by a payment of $5 per thousand feet for all timber cut, logged, and shipped from the company's land, and $2.50 per thousand feet for timber cut, logged, and shipped from leased land, which payments represented the fair market price of such timber in that section at that time, and, second, by the payment of $1 per thousand feet for milled lumber, which payment represented a fair rental price for the use of the sawmill. Thus the petitioners arranged to liquidate the timber as used and the mill as it depreciated through such use. So far as the record discloses, the payments to the trustees for the stockholders were made in accordance with the terms of their agreements. The petitioners speculated on their ability successfully to operate the Company and liquidate its properties. They, in a way, guaranteed that the stockholders would receive an agreed amount,

or the then book value of their stock, and that the petitioners would receive everything above that amount as their reward. When the payments (which in so far as the record discloses were made by the company) totaled the amount agreed upon, the stockholders surrendered their stock certificates and thereafter those certificates represented the petitioners' interest in the Lumber Company, which was the remainder of its property which they determined gave the stock a book value of $172,343.26. In effect, they received that amount for liquidating assets that had a value of $1,788,169.29 in 1919, and treated that amount as income in the year in which the stock was transferred to them.

In these proceedings the respondent relies principally upon the decision of the Court of Claims in *Long* v. *United States*, 66 Ct. Cls. 475, and *Chester N. Weaver*, 21 B. T. A. 1283. The syllabus of the Court of Claims in the first case mentioned reads:

*Income tax; dividends applied by trustee to purchase price of shares of stock; income of purchaser.*—Under the terms of a contract of sale the shares of stock sold were indorsed in blank and deposited with a trust company, payment therefor being made in installments, the dividends being applied by the trust company in satisfaction of the purchase price and interest thereon, the vendor retaining his voting rights on the balance of the shares unpaid for, the shares as they were paid for being transferred to the purchaser. The purchaser kept his books and made his tax returns on a "cash received and paid" basis. *Held*, that the dividends paid to the trustee on shares not yet transferred to the purchaser constituted taxable income to the purchaser for the year in which paid.

That case is distinguishable from the instant proceedings upon its facts. Long had bargained for the purchase of certain shares of stock at a price of $230,000. The stock was placed in the hands of a trustee until payment was made. Dividends were paid upon the stock and the court held that those dividends were income of the vendee. In the instant proceedings no dividends were declared upon the stock, title to which remained in the trustees for the stockholders until their interest in the corporation was liquidated. The cases are clearly distinguishable.

In the *Weaver* case certain stockholders contributed $100,000 to the surplus of the corporation. Subsequently a dividend was paid in the amount of $100,000. We held that such a distribution was a taxable dividend. No such facts obtained in the instant proceedings.

In the circumstances presented by the proceedings at bar the respondent's determination can not be sustained. Viewing the transaction as we do, it will not be necessary categorically to dispose of the several issues raised by the pleadings.

*Judgments will be entered for the petitioners.*